**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| DOUGLASS WILLIAMS,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF WARREN;<br>GEORGE L. DIMAS, in his individual capacity;<br>GUS GHANAM, in his individual capacity;<br>NICHOLAS LIENEMANN, in his individual capacity,<br><br>Defendants. | Case No. ______________<br>Hon. ________________ |

**Leonard Mungo (P43562)**
Mungo & Mungo at Law, PLLC
Attorneys for Plaintiff
31700 Telegraph Rd., Ste 250
Bingham Farms, MI 48025
(248) 792-7557 (phone)
(248) 792-7303 (fax)
Caseaction@Mungoatlaw.com

**PLAINTIFF'S COMPLAINT AND DEMAND FOR JURY TRIAL**

**THERE IS NO OTHER PENDING OR RESOLVED CIVIL ACTION BETWEEN THE PARTIES ARISING OUT OF THE TRANSACTION OR OCCURRENCE ALLEGED IN THIS COMPLAINT**

Plaintiff Douglass Williams, by and through counsel, Mungo & Mungo at Law, PLLC, files this Complaint against Defendants City of Warren, George L. Dimas, Gus Ghanam, and Nicholas Lienemann, and states as follows:

## INTRODUCTION

1. This action arises from the unconstitutional, racially discriminatory, and retaliatory termination of Plaintiff Douglass Williams—a fifteen-year employee of the City of Warren and the first African American Property Maintenance Inspector in the City's history—who was fired without any pre-deprivation hearing, hours after he invoked his right to retain

counsel during a police interview, based on a knowingly false characterization of a pending misdemeanor charge as a "felony," and well before any adjudication of guilt. A jury of his peers later unanimously acquitted Plaintiff of the sole charge against him.

2. On the morning of September 7, 2023, Plaintiff sat for a voluntary interview with Defendant Detective Nicholas Lienemann of the Warren Police Department. When Plaintiff stated that he wished to retain counsel, Defendant Lienemann ended the interview. Approximately five (5) hours later, Plaintiff was summoned to the office of Defendant Gus Ghanam, his Public Service Supervisor, and summarily fired. Defendant Ghanam told Plaintiff that he "didn't know what was going on" and "didn't want to know what was going on." At the time of this termination, no criminal charge had been filed, no warrant had issued, and no arrest had occurred.

3. On November 1, 2023—the very same day Plaintiff was arraigned on a single misdemeanor count of Brandishing a Firearm in Public under MCL 750.234e, punishable by a maximum of ninety (90) days in jail and a $100 fine—Defendant George L. Dimas, as Human Resources Director for the City of Warren, signed a letter terminating Plaintiff's employment on the false stated ground that the charge "amount[ed] to a felony." It did not. The charge was, and always had been, a misdemeanor.

4. Plaintiff was never afforded notice of the charges against his employment, a pre-termination hearing, a meaningful opportunity to respond, or any post-termination appellate process before being deprived of his property interest in continued employment.

5. On November 4, 2024, after multiple adjournments, multiple cancelled trials, and at least five plea offers Plaintiff refused, a jury in the 37th District Court for the City of Warren unanimously found Plaintiff NOT GUILTY. *State of Michigan v. Williams*, Case No. 2023-W234519-SM (Hon. Steven M. Bieda).

6. Plaintiff brings this action under 42 U.S.C. § 1983 for violations of his rights under the First, Fourth, and Fourteenth Amendments to the United States Constitution; under Michigan's Elliott-Larsen Civil Rights Act for race discrimination in employment, MCL 37.2101 et seq.; under MCL 37.2205a, which forbids an employer that is not a law enforcement agency from requesting, making, or maintaining a record of a misdemeanor

arrest, detention, or disposition where no conviction resulted; and under Michigan common law for intentional infliction of emotional distress.

## JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343(a)(3) and (4) (civil rights).

8. This Court has supplemental jurisdiction over Plaintiff's state-law claims pursuant to 28 U.S.C. § 1367(a), as those claims are so related to the federal claims that they form part of the same case or controversy.

9. Venue is proper in the Eastern District of Michigan, Southern Division, pursuant to 28 U.S.C. § 1391(b)(1) and (2), because Defendant City of Warren is located within this District and Division, at all relevant times hereto, all individual Defendants reside or work within this District and Division, and a substantial part of the events and omissions giving rise to the claims occurred in the City of Warren, Macomb County, Michigan.

## PARTIES

10. Plaintiff Douglass Williams is a sixty-six (66) year-old African American man and a resident of the City of Warren, Macomb County, Michigan. At all times relevant to this Complaint, Plaintiff was employed by the City of Warren, most recently serving as a Property Maintenance Inspector.

11. Defendant City of Warren (the "City") is a Michigan municipal corporation organized under the laws of the State of Michigan, located in Macomb County. At all relevant times, the City was Plaintiff's employer and was acting under color of state law and as an employer of Plaintiff as defined by ELCRA.

12. Defendant George L. Dimas at all relevant times served as the Human Resources Director for the City of Warren. He signed both the September 11, 2023 Notice of Unpaid Administrative Leave and the November 1, 2023 letter purporting to terminate Plaintiff's employment. He is sued in his individual capacity. At all relevant times, Defendant Dimas acted under color of state law.

13. Jim R. Fouts at all relevant times through November 2023 served as the Mayor of the City of Warren. Under the Warren City Charter and applicable City policies, Mayor Fouts was

a final policymaker for the City with respect to decisions regarding the hiring, discipline, and termination of City employees. Although Mayor Fouts is not named as a defendant herein, the conduct described in this Complaint that is attributed to him—including his receipt of the November 1, 2023 termination letter and his approval and ratification of the decision to terminate Plaintiff—is set forth to establish the City's liability under *Monell* and the concerted actions of the named Defendants. At all relevant times, Mayor Fouts was acting under color of state law.

14. Defendant Gus Ghanam at all relevant times served as a Public Service Supervisor for the City of Warren. He personally communicated Plaintiff's termination to Plaintiff on September 7, 2023, was involved in and received copies of the communications effectuating Plaintiff's suspension and termination, and participated in the decision to terminate Plaintiff. He is sued in his individual capacity. At all relevant times, Defendant Ghanam acted under color of state law.

15. Bob Scott at all relevant times served as Property Maintenance Manager for the City of Warren and was Plaintiff's direct supervisor within the Property Maintenance Department. Although Mr. Scott is deceased and is not named as a defendant herein, the conduct described in this Complaint that is attributed to him is set forth to establish the City's liability under *Monell* and the concerted actions of the other named Defendants. At all relevant times, Mr. Scott was acting under color of state law.

16. Defendant Nicholas Lienemann at all relevant times served as a Detective with the Warren Police Department. Defendant Lienemann conducted the September 7, 2023 interview of Plaintiff, signed the September 25, 2023 letter informing Plaintiff that he was a "suspect" and that a misdemeanor warrant had been issued, communicated with Detective Jim Twardesky regarding Plaintiff's surrender, communicated directly or indirectly with City of Warren personnel regarding the investigation and Plaintiff's employment, and initiated, influenced, or otherwise participated in the decision to prosecute Plaintiff. He is sued in his individual capacity. At all relevant times, Defendant Lienemann acted under color of state law.

17. At all times relevant to this Complaint, each individual Defendant was acting under color of state law within the meaning of 42 U.S.C. § 1983 and as an agent, employee, and/or

final policymaker of Defendant City of Warren or, in the case of Defendant Lienemann, of the City of Warren acting through its Police Department.

## FACTUAL ALLEGATIONS

### A. Plaintiff's Fifteen Years of Distinguished Service to the City of Warren.

18. Plaintiff began his employment with the City of Warren in or about 2008 and was continuously employed by the City for approximately fifteen (15) years prior to his unlawful termination.

19. During his tenure with the City, Plaintiff served in multiple positions, including in Warren Senior Housing (approximately five (5) years), Warren Community Outreach (approximately one (1) year), and Warren Parks and Recreation (approximately three and one-half (3.5) years).

20. For the approximately five and one-half (5.5) years immediately preceding his termination, Plaintiff served as a Property Maintenance Inspector for the City of Warren. Plaintiff was the first African American ever to hold the position of Property Maintenance Inspector in the City of Warren.

21. Plaintiff received a Proclamation from then-Mayor Jim R. Fouts in or about September 2009 in recognition of his service to the City. Plaintiff served as a City of Warren Pastors AWE member for approximately ten (10) years and served as a Pastor attendee and intercessor for the City of Warren at the National Day of Prayer from 2009 through 2018.

22. Plaintiff was, at all times relevant, a full-time, non-union, non-mayoral-appointee classified employee of the City of Warren. Plaintiff was not a member of any bargaining unit and was not a party to any collective bargaining agreement with the City.

23. The City of Warren, through its current Mayor, has publicly and repeatedly acknowledged the scope and force of its civil service system and its application to full-time classified employees such as Plaintiff. In a public statement issued on or about April 21, 2026, in connection with her veto of a City Council ordinance that would have weakened the city's Civil Service Ordinance, Mayor Lorie M. Stone stated: "Council's changes would weaken fairness, transparency, and accountability in how full-time city employees are hired, promoted, and disciplined." She further stated that the proposed ordinance "would remove

the Civil Service Commission's core functions and responsibilities including testing, hiring, demotions, transfers, and classification decisions." The Mayor also noted that civil service rules "guide personnel management processes and appeals" for both non-union employees and union employees whose collective bargaining agreements incorporate civil service rules. The City's own Council Attorney separately confirmed, in the same public proceeding, that the civil service system "applies primarily to classified, non-union employees." These public admissions by Warren's final policymaker and the City's own legal counsel confirm the civil service framework and its just-cause protections applicable to Plaintiff at the time of his termination.

24. By reason of the foregoing, Plaintiff possessed a constitutionally protected property interest in his continued employment with the City of Warren that could not be taken from him except pursuant to constitutionally adequate procedures. That property interest is grounded in the Warren Civil Service Ordinance, Warren City Code Article III, which: (a) establishes a merit system for all full-time city employees not listed among the article's enumerated exempt positions (Secs. 25-23 and 25-24)—Plaintiff's position of Property Maintenance Inspector is not among those exempt positions; (b) expressly limits demotions, suspensions, and discharges to just cause—specifically "inefficiency, incompetency, physical or mental incapacity, insubordination, neglect of duty, misfeasance or malfeasance in office"—and requires written notice to the employee and the Civil Service Board within five (5) working days and affords the employee ten (10) working days to file a written answer (Sec. 25-129; Exhibit A, p. 5); (c) provides that tenure in city service is conditioned on "good behavior and efficient service" and vests the Civil Service Board with power to review all dismissals and suspensions of more than five (5) days (Sec. 25-130; Exhibit A, p. 5); (d) affords aggrieved employees the right to petition the Civil Service Board within ten (10) working days of a removal or suspension, the right to a full and impartial hearing within ten (10) working days of the petition, the right to be represented by counsel, and the right to confront accusers (Secs. 25-132 and 25-133; Exhibit A, pp. 5–6); and (e) authorizes the Civil Service Board to confirm, modify, or reverse any adverse action on appeal, with reinstatement entitling the employee to back compensation, and with further appeal to the circuit court where removal results (Sec. 25-134; Exhibit A, p. 6). A

true and correct copy of the relevant provisions of Warren City Code Article III is attached hereto as Exhibit A. None of these procedures was afforded to Plaintiff.

25. In the alternative and in addition, Plaintiff's property interest in continued employment arose from the City of Warren's personnel policies, employment manual, past practices, and long-standing course of dealing, which together created a legitimate expectation that Plaintiff could not be terminated except for just cause and in accordance with established procedures. See *Toussaint v. Blue Cross & Blue Shield of Michigan*, 408 Mich 579 (1980).

26. Prior to September 6, 2023, Plaintiff had a spotless employment and criminal record. Over fifteen (15) years of service to the City of Warren, and over five (5) years in the Property Maintenance Department specifically, Plaintiff had never been disciplined, counseled, written up, or otherwise addressed for any alleged negative or poor performance, and was regarded as a top performer in his position. Plaintiff likewise had no criminal record prior to the unadjudicated misdemeanor charge of which he was ultimately acquitted.

27. Plaintiff was 63 years of age on the date of his termination. Plaintiff intended to continue working for the City of Warren until approximately the age of 70, a seven-year period of lost future earning capacity.

**B. Prior Race-Based Disparate Treatment of Plaintiff by City Officials.**

28. Plaintiff's transfer to the Property Maintenance Department was itself the consequence of disparate, race-based treatment Plaintiff endured from a prior Caucasian female supervisor in another City department, who subjected Plaintiff to ill treatment that necessitated his transfer.

29. Upon Plaintiff's appointment as the first African American Property Maintenance Inspector in the City of Warren, City supervisory personnel did not permit Plaintiff to work within the Property Maintenance Department itself for approximately the first two (2) years of his service in that position. During that period, Plaintiff was instead required to (a) work first at the edge of another employee's desk in a different department down the hall; and (b) thereafter work alone at a desk located in the corner of a hallway, segregated from the rest of the Property Maintenance Department.

30. Only after Plaintiff's ticket production and inspection metrics exceeded those of his Caucasian counterparts was Plaintiff permitted to work within his assigned department alongside his fellow inspectors. The two-year segregation of Plaintiff from his assigned department, and the conditioning of his integration on demonstrated superior performance, reflected disparate treatment based on race and a culture of differential treatment of African American employees within the City of Warren that was tolerated and ratified by City supervisory personnel.

**C. The September 6, 2023 Off-Duty, Off-Property Incident.**

31. On the evening of September 6, 2023, Plaintiff was off-duty and on his own residential property in Warren, Michigan.

32. Plaintiff observed two Caucasian women—later identified as Veronica Lewis and Veronica Miazga, volunteers with Together We Save, a volunteer organization based in Warren, Michigan—walking through his neighbor's yard after dark using flashlights. Lewis and Miazga were not City of Warren employees. They were not in uniform, were not displaying any identification or badges, and were not using any marked City of Warren vehicle.

33. When Plaintiff inquired as to the women's identity and purpose, they stated that they were "with animal control." When Plaintiff asked to see their badges, they confirmed they did not have any. Neither Lewis nor Miazga had any authority to conduct animal control operations on behalf of the City of Warren.

34. Plaintiff went to his neighbor's door to alert him. The neighbor confirmed that he had not given the women permission to be on his property.

35. Thereafter, one of the women approached Plaintiff aggressively on foot across a distance of approximately 100 feet, making rude gestures and using profanity as she advanced toward Plaintiff's driveway. Plaintiff stood his ground on his own property.

36. Plaintiff called 911. The woman also called 911. Officers from the Warren Police Department responded, took statements from all parties, and provided incident slips advising that detectives would follow up. No arrest was made at the scene.

37. The Warren Police Department's own Crime Report (Case No. 230050500-001) reflects that the female complainants acknowledged that the alleged "firearm was never pointed at

them," that Plaintiff stated he "never had his firearm on him, and never made any threats," and that the incident occurred on or adjacent to Plaintiff's own property.

38. Upon information and belief, Plaintiff's neighbor, Colleen Wilson (the same neighbor onto whose property Lewis and Miazga had walked), was subpoenaed by the prosecution and appeared at the 37th District Court on May 2, 2024, the date scheduled for the bench trial in Plaintiff's criminal case. In the presence of the prosecutor, Plaintiff, Plaintiff's wife, and Plaintiff's counsel, Colleen Wilson stated that Lewis was the aggressor in the September 6, 2023 confrontation with Plaintiff. Upon information and belief, following this disclosure the prosecution declined to proceed, and the bench trial scheduled for May 2, 2024 was cancelled.

**D. The September 7, 2023 Police Interview, Plaintiff's Invocation of His Right to Counsel, and Plaintiff's Same-Day Termination.**

39. On the morning of September 7, 2023, at approximately 10:00 a.m., Plaintiff sat for a voluntary interview with Defendant Detective Nicholas Lienemann of the Warren Police Department concerning the prior evening's incident.

40. Within minutes of the start of the interview, Plaintiff stated to Defendant Lienemann that he wished to retain counsel. Defendant Lienemann acknowledged Plaintiff's invocation of his right to counsel, ended the interview, provided Plaintiff with his business card, and shook Plaintiff's hand as Plaintiff departed.

41. Approximately five (5) hours later, at approximately 3:00 p.m. on the very same day, September 7, 2023, Plaintiff was summoned to the office of Defendant Gus Ghanam—his Public Service Supervisor—and was informed he was terminated.

42. Defendant Ghanam told Plaintiff words to the effect that he "didn't know what was going on" and "didn't want to know what was going on," and represented that the charge against Plaintiff was "now a felony." At that moment, no charge of any kind—felony or misdemeanor—had been filed; no warrant had issued; and no arrest had occurred.

43. The temporal proximity between Plaintiff's invocation of his right to counsel during the police interview and his summary termination later the same day, together with Defendant Ghanam's admission that he "didn't know what was going on," supports the inference—

and Plaintiff alleges on information and belief—that Defendant Lienemann or another agent of the Warren Police Department communicated with Defendants Dimas and Ghanam and/or with Mayor Fouts concerning Plaintiff's invocation of counsel, the existence of the encounter under investigation, and/or the contemplated charging decision; and that Plaintiff's same-day termination was a direct response to and retaliation for Plaintiff's invocation of counsel.

44. Plaintiff was provided no written notice of any charges against his employment, no opportunity to respond to any charges, no hearing, no representative present, and no information regarding any right of appeal. The decision to terminate Plaintiff on September 7, 2023 was made without the benefit of any investigation, without review of any finalized police report, and without any consideration of Plaintiff's fifteen-year employment record.

**E. The September 11, 2023 Backdated "Administrative Leave" Letter.**

45. Four days after orally terminating Plaintiff, on September 11, 2023, Defendant Dimas sent a letter to Plaintiff purporting to place him on "unpaid administrative leave pending an investigation." The letter was copied to Defendant Ghanam, to Jacqueline Damron, and to Bob Scott.

46. The September 11, 2023 letter was, in substance, an after-the-fact paper recharacterization of Plaintiff's already-completed September 7, 2023 termination, designed to create the appearance of process where none had been afforded.

47. The September 11, 2023 letter directed Plaintiff to surrender his key card, office, and files; prohibited Plaintiff's access to City technology, email, and software; and barred Plaintiff from Warren City Hall property. The letter provided no notice of any specific charges, identified no policy allegedly violated, and offered no opportunity to respond before Plaintiff was deprived of pay, benefits, and access to his place of employment.

**F. The Misdemeanor Charge—Never a Felony.**

48. On September 20, 2023, the State of Michigan filed a single-count criminal complaint against Plaintiff in the 37th District Court charging Plaintiff with one count of Brandishing a Firearm in Public in violation of MCL 750.234e. *State of Michigan v. Williams*, Case No. 2023-W234519-SM.

49. MCL 750.234e is a misdemeanor offense punishable by imprisonment for not more than ninety (90) days, a fine of not more than $100.00, or both. It is not, and has never been, a felony under Michigan law.

50. At no time during the pendency of the criminal case was the charge upgraded, amended, or reduced. The Register of Actions maintained by the 37th District Court reflects a single misdemeanor count throughout the proceedings, from original charging on September 20, 2023, through disposition on November 4, 2024.

**G. Detective Lienemann's September 25, 2023 "Suspect" Letter and the Demand that Plaintiff Surrender.**

51. On or about September 20, 2023, Defendant Lienemann directed or caused Detective Jim Twardesky of the Warren Police Department to telephone Plaintiff and demand that Plaintiff "turn himself in" in connection with the pending charge or face issuance of an arrest warrant by the close of business that day.

52. On September 25, 2023, Plaintiff received a letter from the Warren Police Department, signed by Defendant Lienemann, stating that the Warren Police Department had "investigated the case," that Plaintiff was listed as a "suspect," that a misdemeanor warrant had been issued for Plaintiff's arrest, and directing Plaintiff to make arrangements to turn himself in.

53. On September 26, 2023, Plaintiff retained criminal defense counsel, Attorney Matthew Rosenthal, then of Goldman & Associates Law Firm, who appeared on Plaintiff's behalf in the criminal proceedings.

**H. The October 30, 2023 Booking Confusion.**

54. On October 30, 2023, on the instruction of his counsel, Plaintiff appeared at the Warren Police Department to be fingerprinted and to commence the booking process for his pending arraignment. Plaintiff identified himself, identified his counsel, and stated his purpose to the desk attendant.

55. During his time at the Warren Police Department on October 30, 2023, Plaintiff spoke for approximately seven (7) minutes in front of the police window with a City of Warren coworker. Notwithstanding the public assertion later made by the prosecution at Plaintiff's

November 1, 2023 arraignment that an outstanding bench warrant existed against Plaintiff in Midland, Michigan, no officer of the Warren Police Department detained Plaintiff or made any reference to any such warrant during the October 30, 2023 visit.

56. After consultation among Plaintiff, his counsel, and the Warren Police Department, Plaintiff was advised that he must return on a subsequent date for in-person booking, which Plaintiff did on November 1, 2023.

## I. The November 1, 2023 Arraignment, Booking, and the Mysterious "Midland Bench Warrant."

57. On November 1, 2023, at approximately 8:30 a.m., Plaintiff turned himself in at the Warren Police Department for booking on the pending misdemeanor charge.

58. Plaintiff was placed in handcuffs, escorted upstairs to the holding cell area, and held in a holding cell pending arraignment. Plaintiff was required to strip down to his shirt, pants, socks, and underwear; his necktie, belt, and jacket were removed. The combination of these compulsory removals, the holding cell, and the public booking process subjected Plaintiff to humiliation and to a significant restraint on his liberty.

59. Although the 37th District Court was located immediately next door to the Warren Police Department, Plaintiff's arraignment was conducted by Zoom video conference rather than in person. Upon information and belief, the conversion of Plaintiff's arraignment from in-person to Zoom was undertaken to limit public visibility of the proceeding given Plaintiff's standing in the City and community as a long-tenured Property Maintenance Inspector.

60. Plaintiff was arraigned via Zoom before the Honorable John M. Chmura. Plaintiff entered a plea of not guilty and was released on a personal bond.

61. At the outset of the arraignment, before Plaintiff's counsel could be heard on the misdemeanor charge, the prosecutor announced that Plaintiff was the subject of an outstanding bench warrant in Midland, Michigan. Plaintiff had never been to Midland, Michigan in his life and had no knowledge of any proceeding pending against him there.

62. After Plaintiff's counsel introduced Plaintiff to the court as a long-tenured Top Property Maintenance Inspector for the City of Warren who routinely worked alongside the 37th District Court in connection with City property-maintenance enforcement matters, the

prosecutor's screen abruptly went black, the prosecutor disappeared from the Zoom proceeding, and Judge Chmura visibly reacted to the new information about Plaintiff's identity and role. The prosecutor did not return to the Zoom call for the remainder of the proceeding. The purported "Midland bench warrant" was never thereafter raised, mentioned, prosecuted, or substantiated.

63. The next day's entries on Plaintiff's court record reflected that Plaintiff was scheduled for a "Bench warrant arraignment" in connection with the purported Midland matter, as if Plaintiff had had prior knowledge of the warrant and had appeared in court that day to address it. Plaintiff had no such prior knowledge of the pretextual and non-existent warrant.

64. Upon information and belief, the purported "Midland bench warrant" was either fabricated or improperly entered into a court or law-enforcement record system by Defendant Lienemann or others acting in concert with him, in order to lend credibility and gravity to the misdemeanor charge against Plaintiff and to support the City of Warren's contemporaneous decision to formally terminate Plaintiff's employment.

## J. The November 1, 2023 Termination Letter Falsely Characterizing the Charge as a "Felony."

65. On November 1, 2023, the very same day as Plaintiff's arraignment, Defendant Dimas signed and issued a letter to Plaintiff formally purporting to terminate his employment with the City of Warren, effective immediately.

66. The November 1, 2023 termination letter states, in material part, that the charges "amount to a felony and conduct unbecoming a City of Warren employee" and that, "[a]s a result of these charges, your employment with the City of Warren is terminated effective immediately."

67. The statement that the charges "amount to a felony" was false. It was demonstrably false on the face of the public court record then available. It was false when made and it remains false. Plaintiff was never charged with a felony; the sole charge was a misdemeanor under MCL 750.234e.

68. Defendant Dimas knew, or in the exercise of reasonable diligence should have known, that the charge was a misdemeanor and not a felony, because (a) the criminal complaint and

Register of Actions were publicly available, (b) the Warren Police Department itself had initiated the charges and knew the charge class, and (c) any reasonable investigation of the charge—as the September 11 letter represented the City was conducting—would have immediately revealed the charge class. Defendant Dimas's false characterization of the charge as a felony was, alternatively, made with reckless disregard for its truth or falsity.

69. The November 1, 2023 termination letter was published, by carbon copy and intracorporate distribution, to Defendant Ghanam, the Mayor's Office (then-Mayor Fouts), the Office of the Mayor of the City of Warren generally, the City's Payroll Department, the Human Resources Department, and Jacqueline Damron. Each such publication communicated the false statement that Plaintiff's charge "amount[ed] to a felony" and the additional imputation of "conduct unbecoming a City of Warren employee."

70. At no point between September 7, 2023, and November 1, 2023, did the City of Warren or any Defendant provide Plaintiff with a pre-termination hearing, notice of specific charges against his employment, an opportunity to present his side of the story, or a post-termination appellate process in compliance with due process.

**<u>K. Defendants' Reliance on an Unadjudicated Misdemeanor Charge Violated MCL 37.2205a.</u>**

71. Section 205a of the Elliott-Larsen Civil Rights Act, MCL 37.2205a, prohibits an employer—other than a law enforcement agency—from requesting, making, or maintaining a record of information regarding a misdemeanor arrest, detention, or disposition "where a conviction did not result," in connection with the terms, conditions, or privileges of employment. The statute's sole charge-based exception is for "information relative to a felony charge before conviction or dismissal."

72. Defendant City of Warren is a "political subdivision" within the meaning of MCL 37.2205a and therefore falls within the statute's employer-level exception. This claim does not run against the City on this basis. However, the individual Defendants named in this Count—Dimas and Ghanam—are natural persons, not political subdivisions. The statutory exception is an employer-entity carve-out that defines which employers are covered; it does not insulate individual agents from liability for personally participating in the prohibited conduct. To hold otherwise would render ELCRA's individual-agent liability provision,

MCL 37.2202 and *Elezovic v. Ford Motor Co.*, 472 Mich 408 (2005), a nullity in all public employment contexts—a result the Legislature plainly did not intend.

73. Neither Defendant Dimas nor Defendant Ghanam is a law enforcement officer employed by a law enforcement agency engaged in law enforcement activities with respect to Plaintiff's employment.

74. The statute's exception for "information relative to a felony charge before conviction or dismissal" does not apply, because Plaintiff was never charged with a felony. The sole charge against Plaintiff was a misdemeanor under MCL 750.234e.

75. At the time Plaintiff was placed on unpaid administrative leave on September 11, 2023, no conviction had resulted. At the time Plaintiff was terminated on November 1, 2023, no conviction had resulted. On November 4, 2024, a jury unanimously acquitted Plaintiff, and no conviction has ever resulted.

76. Each individual Defendant named in this Count, in connection with the terms, conditions, and privileges of Plaintiff's employment, personally requested, made, and/or maintained records of information regarding Plaintiff's misdemeanor arrest, detention, and disposition where a conviction did not result, including without limitation: (a) the September 11, 2023 letter referencing "the incident that occurred on Wednesday, September 6, 2023" and imposing unpaid suspension; (b) the November 1, 2023 termination letter reciting "the police report dated September 6, 2023, involving misuse of carrying a concealed weapon and brandishing a firearm" and "these charges" as the basis for termination; (c) the internal HR and personnel records documenting the same; and (d) communications among and between Defendants regarding the pending misdemeanor charge.

77. Defendants' mischaracterization of the misdemeanor charge as a "felony" in the November 1, 2023 termination letter does not, and cannot, invoke the "felony charge" exception in MCL 37.2205a. That exception is defined by the actual legal character of the charge, not by an employer's erroneous or pretextual recharacterization of it.

**L. Plaintiff's Post-Termination Requests for Information Were Ignored.**

78. By letter dated December 8, 2023, Plaintiff wrote to the City of Warren Human Resources Department inquiring about his "premature/wrongful termination," expressly noting that

there had been no legal upgrade of charges, no conviction, no adjudication, and no due process afforded to him. Plaintiff received no substantive response.

79. By letter dated January 10, 2024, Plaintiff wrote to then-incoming Mayor Lorie M. Stone regarding the same, enclosing the September 11, 2023 suspension letter and the November 1, 2023 termination letter and explicitly detailing the absence of due process, the falsity of the "felony" characterization, and the pendency of an unadjudicated misdemeanor charge. Plaintiff received no substantive response.

80. In or about February 2024, Plaintiff applied for unemployment compensation. The City of Warren contested the application, alleging misconduct. The State of Michigan ruled against the City, finding the City had failed to establish misconduct, and Plaintiff's unemployment benefits were awarded and paid retroactively to the period commencing on his termination.

**M. The Pattern of Prosecution Manipulation Following Plaintiff's Refusal to Plead.**

81. Following the November 1, 2023, arraignment, Plaintiff's misdemeanor case was repeatedly set for pretrial, bench trial, and jury trial, and repeatedly adjourned, cancelled, or converted from one type of proceeding to another, over the course of approximately twelve (12) months and across at least eight (8) scheduled appearances, before any trial proceedings were actually held.

82. During the course of those proceedings, the prosecution presented Plaintiff with at least five (5) separate plea offers, each of which Plaintiff declined. The prosecutor on Plaintiff's case stated to Plaintiff's counsel words to the effect that the prosecution "did not even want to take it to trial." At least five or six different prosecutors and two different judges presided over Plaintiff's case during its pendency.

83. On at least three occasions, after Plaintiff and his counsel appeared ready and willing to proceed to bench trial, Judge Steven M. Bieda "reserv[ed] the right" for a jury trial and converted the bench trial to a future jury trial, postponing adjudication and resetting Plaintiff's case for further proceedings.

84. On May 2, 2024, the bench trial was again cancelled approximately forty-five (45) minutes before its scheduled start, after the subpoenaed neighbor witness, Colleen Wilson, appeared at court and informed the prosecution—in the presence of Plaintiff, Plaintiff's wife, and

Plaintiff's counsel—that Lewis was the aggressor in the September 6, 2023, encounter, and after Plaintiff's fifth plea offer was declined.

85. A jury trial scheduled for August 12, 2024, was "mysteriously cancel[l]ed" approximately two business days before its scheduled start. The jury trial was eventually held on November 4, 2024, three months after the August cancellation.

86. Upon information and belief, the pattern of repeated cancellations, conversions, and reschedulings was designed to coerce Plaintiff into accepting a plea by attrition and to delay public adjudication of the charge against him—the public adjudication of which would expose both the falsity of the City's "felony" characterization and the irregularities surrounding the prosecution itself.

**N. The November 4, 2024 Jury Acquittal.**

87. On November 4, 2024, a jury trial was held before the Honorable Steven M. Bieda of the 37th District Court. The jury returned a unanimous verdict of NOT GUILTY on the sole charge of Brandishing a Firearm in Public.

88. The Register of Actions for Case No. 2023-W234519-SM reflects: "JURY TRIAL HELD … FOUND NOT GUILTY BY JURY … CASE CLOSED." The disposition entry is dated November 4, 2024.

89. The November 4, 2024, jury acquittal constitutes a favorable termination of the criminal proceeding for purposes of Plaintiff's claims under 42 U.S.C. § 1983 and Michigan common law. See *Thompson v. Clark*, 596 U.S. 36 (2022).

**O. Disparate Treatment of Plaintiff Based on Race.**

90. Plaintiff is African American. He was the first African American to hold the position of Property Maintenance Inspector in the City of Warren.

91. Upon information and belief, similarly situated Caucasian employees of the City of Warren who were accused of, charged with, or otherwise alleged to have committed off-duty misdemeanor offenses—including offenses of equivalent or greater seriousness than Brandishing a Firearm in Public under MCL 750.234e—were not summarily terminated, were afforded pre-termination process, were placed on paid (rather than unpaid)

administrative leave, and/or received significantly more lenient discipline than Plaintiff received.

92. Throughout Plaintiff's tenure with the City, Plaintiff observed numerous instances in which similarly situated Caucasian City of Warren employees and members of the Warren community engaged in alleged misconduct of comparable or greater seriousness than the conduct alleged against Plaintiff and were not prosecuted, were not terminated, or received discipline materially less severe than the summary termination imposed on Plaintiff.

93. Defendants' summary termination of Plaintiff based on an unadjudicated misdemeanor charge—which they falsely characterized as a felony in the termination letter—and without any pre-termination process, departed sharply from the City's treatment of similarly situated non-African American employees and was motivated, in whole or in part, by racial animus or conscious indifference to Plaintiff's race.

**<u>P. Personal Involvement of Each Individual Defendant.</u>**

94. Defendant Ghanam personally summoned Plaintiff to his office on September 7, 2023, communicated the termination to Plaintiff, told Plaintiff that he did not want to know the facts and that the charge was "now a felony" before any charge of any kind had been filed, and was copied on the subsequent termination correspondence. Defendant Ghanam's personal actions deprived Plaintiff of pre-termination process and contributed to the termination decision.

95. Defendant Dimas signed the September 11, 2023, suspension letter and the November 1, 2023, termination letter. Defendant Dimas authored, issued, and is responsible for the false statement that the charge "amount[ed] to a felony," and for the decision to terminate Plaintiff without pre-termination process. Defendant Dimas published the November 1, 2023, termination letter to multiple intracorporate recipients within the City of Warren.

96. Mayor Fouts, as the then-sitting Mayor of the City of Warren and the City's final policymaker in matters of employee discipline and termination, received the November 1, 2023 termination letter via the "Mayor's Office" carbon-copy and, upon information and belief, approved and ratified the decision to terminate Plaintiff. Although Mayor Fouts is not named as a defendant, his approval and ratification of that decision, in his capacity as

final policymaker, rendered the decision the official policy of Defendant City of Warren for purposes of Count V. See *City of St. Louis v. Praprotnik*, 485 U.S. 112 (1988).

97. Defendant Lienemann personally conducted the September 7, 2023, interview of Plaintiff at which Plaintiff invoked his right to counsel; signed the September 25, 2023, letter declaring Plaintiff a "suspect" and demanding his surrender; communicated with or directed Detective Twardesky to threaten Plaintiff with arrest; initiated and influenced the prosecution of Plaintiff; and, upon information and belief, communicated directly or indirectly with one or more City of Warren personnel concerning Plaintiff's invocation of counsel and concerning the contemplated charging decision in advance of Plaintiff's September 7, 2023, termination.

**Q. Plaintiff's Good-Faith Efforts to Mitigate Damages.**

98. Following his unlawful termination on September 7, 2023, Plaintiff promptly undertook good-faith and diligent efforts to mitigate his economic damages by seeking comparable employment. Those efforts have been sustained and consistent across more than two and one-half years, spanning October 2023 through the present.

99. In the immediate aftermath of his termination, Plaintiff began receiving Supplemental Security Income (SSI) to stabilize his financial circumstances. Beginning in January 2024, following his successful challenge to the City's misconduct-based opposition, Plaintiff began receiving unemployment compensation retroactive to the date of his termination.

100. In or about June 2024, Plaintiff commenced gig-based employment through DoorDash as a food delivery driver—work materially inferior in compensation, status, benefits, and stability to his former position as a classified Property Maintenance Inspector—in order to maintain some income while continuing his search for full-time comparable employment.

101. Beginning in July 2024, Plaintiff registered with and participated in workforce development services through Michigan Works!, utilizing that state employment support agency to sharpen his job-readiness and expand his reach to available positions. Plaintiff concurrently searched and applied for positions through multiple platforms, including Indeed and GovernmentJobs.com.

102. During 2024 and 2025, Plaintiff advanced to formal interviews with multiple prospective employers, including the Oakland 80 Navigator Program, Gesher Human Services, The Youth Connection, TruGreen, Henry Ford Hospital, and Inter-Con Security. None of these opportunities resulted in an offer of employment comparable to the position from which Plaintiff was unlawfully terminated.

103. From October 2025 through April 2026, Plaintiff engaged in sustained, high-volume application activity across a broad range of industries and positions. Despite this sustained, multi-year, multi-platform, multi-industry job search effort—spanning more than thirty (30) months—Plaintiff has been unable to obtain full-time employment comparable in compensation, benefits, seniority, or status to his former position with the City of Warren. Plaintiff remains underemployed and has suffered a continuing loss of income, benefits, and retirement accruals throughout the entire period.

104. Plaintiff's inability to secure comparable employment is a direct and proximate result of the stigma attached to his publicly stated, false termination for conduct that "amount[ed] to a felony" and constituted "conduct unbecoming a City of Warren employee"—a stigma that attached before any adjudication, persisted throughout a fourteen-month criminal prosecution, and cannot be fully remedied even by his jury acquittal, because the false "felony" characterization originated in a published City of Warren termination letter and was never retracted. Plaintiff's age, the extended gap in his employment history, and the reputational injury inflicted by Defendants have collectively and severely impaired his ability to re-enter the workforce at a comparable level.

**<u>R. Plaintiff's Damages.</u>**

105. Plaintiff has suffered substantial and continuing economic damages as a direct and proximate result of Defendants' conduct, including but not limited to: lost wages and salary from the date of termination through the present; lost overtime, comp time, and other earned compensation (including unpaid comp time accrued prior to September 7, 2023, for which Plaintiff has not been made whole); lost employer-provided health insurance and other benefits (including the improperly early termination of Plaintiff's health coverage on October 31, 2023, before his purported termination date); lost pension and retirement contributions; and loss of future earnings and earning capacity.

106. Plaintiff intended to remain employed with the City of Warren until approximately age 70. Defendants' unlawful termination of Plaintiff at age 63 has deprived him of approximately seven (7) additional years of planned employment, wages, pension accruals, seniority-based compensation, and retirement-benefit growth.

107. Plaintiff has also suffered, and continues to suffer, substantial non-economic damages, including but not limited to: severe emotional distress, anxiety, mental anguish, sleeplessness, humiliation, embarrassment, loss of self-esteem, damage to his standing in his community and his church, and injury to his hard-earned professional reputation as a public servant and as the first African American to hold the position of Property Maintenance Inspector in the City of Warren.

108. Plaintiff's reputational injuries are particularly acute because they arose from a public-facing termination based on a false "felony" characterization and a misdemeanor charge of which Plaintiff was ultimately acquitted by a jury, and because they were inflicted on a fifteen-year employee with a theretofore spotless employment record, a spotless criminal record, and no history of discipline or performance deficiency of any kind.

109. Defendants' conduct was undertaken knowingly, willfully, wantonly, maliciously, and with reckless disregard for Plaintiff's constitutional and statutorily protected rights, warranting the imposition of punitive damages against the individual Defendants and exemplary damages as otherwise provided by law.

## COUNT I
## 42 U.S.C. § 1983 — VIOLATION OF PROCEDURAL DUE PROCESS
## (Fourteenth Amendment)
## (Against Defendant City of Warren and Defendants Dimas and Ghanam, in their Individual Capacities)

110. Plaintiff incorporates by reference the allegations of all preceding paragraphs as if fully set forth herein.

111. The Fourteenth Amendment to the United States Constitution prohibits any state, or any person acting under color of state law, from depriving any person of life, liberty, or property without due process of law.

112. At all times relevant, Plaintiff possessed a constitutionally protected property interest in his continued employment with the City of Warren, derived from (a) the Warren Civil Service Ordinance, Warren City Code Article III, which establishes a merit system for all full-time non-exempt classified employees (Sec. 25-24), limits dismissals to just cause only ("inefficiency, incompetency, physical or mental incapacity, insubordination, neglect of duty, misfeasance or malfeasance in office") and mandates written notice and an opportunity to respond before or immediately upon adverse action (Sec. 25-129), guarantees tenure during good behavior and efficient service subject only to Civil Service Board review (Sec. 25-130), and affords the right to a full and impartial hearing before the Civil Service Board—with the right to counsel and to confront witnesses—upon any dismissal (Secs. 25-132 and 25-133); (b) Plaintiff's position of Property Maintenance Inspector is not among the positions exempt from the civil service article enumerated in Section 25-23 (Exhibit A, pp. 1–2); (c) the City of Warren Charter and the civil service merit system it establishes; and (d) the City's personnel policies, employment manual, and long-standing past practice, which created a legitimate expectation that Plaintiff could not be terminated except for just cause. *Toussaint v. Blue Cross & Blue Shield of Michigan*, 408 Mich 579 (1980). These provisions, individually and collectively, created a legitimate claim of entitlement to continued employment under state and local law sufficient to establish a protected property interest under the Fourteenth Amendment. See *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972). Michigan law presumes that employment relationships are at-will, but that presumption is overcome where the employee shows that he was a "just cause" employee through "(1) proof of a contractual provision for a definite term of employment or a provision forbidding discharge absent just cause; (2) an express agreement, either written or oral, regarding job security that is clear and unequivocal; or (3) a contractual provision, implied at law, where an employer's policies and procedures instill a legitimate expectation of job security in the employee." *Pucci v. Nineteenth Dist. Ct.*, 628 F.3d 752, 765–66 (6th Cir. 2010) (quoting *Lytle v. Malady*, 579 N.W.2d 906, 911 (Mich. 1998)). Plaintiff satisfies the first and third of these alternatives independently: the Warren Civil Service Ordinance expressly forbids discharge absent enumerated just cause, and the City's civil service procedures—including the right to petition the Civil Service Board, the right to a full and impartial hearing, the right to counsel, and the right to confront

accusers—would instill a legitimate expectation of job security in any employee. Indeed, the contractual right to invoke procedures to determine whether a removal was proper is itself sufficient to instill such an expectation even where the employee's position is otherwise terminable without cause. See *Nichols v. Dwyer*, Nos. 20-1232/1803 (6th Cir. May 19, 2021) (unpublished) (employee of Defendant City of Warren stated a protectable property interest on that basis).

113. Plaintiff also possessed a constitutionally protected liberty interest in his good name, reputation, honor, and integrity, which the individual Defendants infringed by making stigmatizing statements in connection with his termination—specifically, the false statement that Plaintiff's conduct "amount[ed] to a felony" and the charge of "conduct unbecoming a City of Warren employee." See *Quinn v. Shirey*, 293 F.3d 315 (6th Cir. 2002); *Ludwig v. Bd. of Trustees of Ferris State Univ.*, 123 F.3d 404 (6th Cir. 1997).

114. Due process required that, prior to the deprivation of these protected interests, Plaintiff be afforded: (a) notice of the charges against his employment; (b) an explanation of the employer's evidence; and (c) a meaningful opportunity to present his side of the story. See *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985).

115. Each of the individual Defendants named in this Count, acting under color of state law, personally participated in depriving Plaintiff of his property and liberty interests without affording any of the process constitutionally required. Specifically: (a) Defendant Ghanam orally terminated Plaintiff on September 7, 2023 without notice, hearing, explanation of evidence, or any opportunity to respond, and falsely told Plaintiff the charge was "now a felony" before any charge of any kind had been filed; (b) Defendant Dimas effectuated an unpaid suspension of Plaintiff on September 11, 2023 without notice of specific charges or any opportunity to respond, by means of a backdated letter calculated to recharacterize the prior summary termination; (c) Defendant Dimas formally terminated Plaintiff on November 1, 2023 without affording him a pre-termination hearing, without providing a meaningful opportunity to respond, and on the basis of a knowingly false or recklessly false statement that the charge was a "felony."

116. At no time before or after his suspension on September 11, 2023, or his termination on November 1, 2023, did Defendants provide Plaintiff with any of the process to which he was entitled.

117. Independent of his termination, Plaintiff was deprived of a protected property interest when Defendants suspended him without pay on September 11, 2023 and maintained him in that status through November 1, 2023. A public employer that suspends an employee without pay must at a minimum provide a prompt post-suspension hearing. *Gilbert v. Homar*, 520 U.S. 924, 929–35 (1997). Plaintiff received neither a pre-suspension hearing nor any post-suspension hearing, prompt or otherwise. Nor were the circumstances that excused a pre-suspension hearing in *Homar* present here: the employee in *Homar* had been arrested and formally charged with a felony before he was suspended, which furnished independent assurance that the charge against him was not baseless. When Defendants suspended Plaintiff without pay on September 11, 2023, no charge of any kind had been filed against him, no warrant had issued, and no arrest had occurred. The sole charge, filed nine (9) days later, was a misdemeanor, and a jury unanimously acquitted Plaintiff of it.

118. No post-deprivation process adequate to cure the pre-deprivation constitutional violation was ever afforded to Plaintiff.

119. Any contention that Plaintiff forfeited his right to due process by failing to invoke the Civil Service Board procedures set forth in Warren City Code Secs. 25-132 through 25-134 is contradicted by the facts alleged herein. The adequacy of a post-deprivation remedy presupposes that the remedy was in fact available to the employee. See *Farhat v. Jopke*, 370 F.3d 580, 596 (6th Cir. 2004). Where an employer's own conduct renders its administrative procedures unavailable to the employee, those procedures cannot satisfy the employee's right under *Loudermill* to a post-termination hearing before a neutral decisionmaker, and the employee's failure to invoke them cannot defeat his claim. See *Rodgers v. 36th Dist. Court*, 529 F. App'x 642, 649 (6th Cir. 2013); *Nichols v. Dwyer*, Nos. 20-1232/1803 (6th Cir. May 19, 2021) (unpublished).

120. Defendants rendered the Warren Civil Service Board procedures unavailable to Plaintiff. Specifically: (a) neither the September 7, 2023 oral termination, the September 11, 2023 suspension letter, nor the November 1, 2023 termination letter identified any charge under

the Civil Service Ordinance, cited any provision of that Ordinance, or advised Plaintiff of any right to petition the Civil Service Board or of the ten (10) working-day period within which such a petition must be filed; (b) upon information and belief, no written notice of Plaintiff's suspension or dismissal was filed with the Civil Service Board within five (5) working days as Sec. 25-129 requires, with the result that the body charged with reviewing the dismissal was never presented with it; (c) the September 11, 2023 letter affirmatively barred Plaintiff from Warren City Hall property, required him to surrender his key card, office, and files, and terminated his access to City technology, email, and software, thereby depriving Plaintiff of the physical and electronic access to the offices and systems through which any such petition would be filed; and (d) Plaintiff's written inquiries of December 8, 2023 to the City of Warren Human Resources Department and of January 10, 2024 to then-incoming Mayor Lorie M. Stone—each of which expressly questioned the absence of any due process afforded him—went entirely unanswered.

121. By reason of the foregoing, the post-deprivation procedures nominally provided by the Warren Civil Service Ordinance were not, in fact, available to Plaintiff. Defendants deprived Plaintiff of his property interest without pre-deprivation process and then foreclosed the only avenue by which that deprivation could have been reviewed.

122. The right of a public employee with a property interest in continued employment to receive notice and a meaningful opportunity to respond before termination has been clearly established since at least *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985)—for over forty (40) years. The right of a public employee not to be subjected to stigmatizing public statements concerning the reasons for his termination without an opportunity to clear his name has been clearly established in this Circuit by, among other authorities, *Quinn v. Shirey*, 293 F.3d 315 (6th Cir. 2002), and *Ludwig v. Bd. of Trustees of Ferris State Univ.*, 123 F.3d 404 (6th Cir. 1997).

123. No reasonable Human Resources Director or Public Service Supervisor of a Michigan municipality could have believed it was constitutionally permissible to summarily terminate a fifteen-year, non-union, classified civil service employee with no prior discipline—five hours after that employee invoked his right to counsel and before any charge of any kind had been filed—and to formalize that termination on the false stated

ground that a misdemeanor charge "amount[ed] to a felony," without notice, hearing, opportunity to respond, or any post-termination appellate process.

124. The individual Defendants' conduct was undertaken intentionally, knowingly, willfully, wantonly, maliciously, and/or with deliberate indifference to Plaintiff's clearly established rights under the Fourteenth Amendment.

125. As a direct and proximate result of the Defendants' conduct, Plaintiff has suffered, and continues to suffer, the following damages:

a. Damages for substantial economic loss and damage, including but not limited to medical expenses, lost wages and lost income;

b. Damages for pain and suffering;

c. Damages for embarrassment, humiliation, outrage, mental anguish, fear and mortification, and stress;

d. Punitive damages, as against the individual Defendants only; and

e. Attorney fees and costs, pursuant to 42 U.S.C. § 1988.

**COUNT II**
**42 U.S.C. § 1983 — VIOLATION OF EQUAL PROTECTION**
**(Fourteenth Amendment — Race Discrimination)**
**(Against Defendants Dimas and Ghanam, in their Individual Capacities)**

126. Plaintiff incorporates by reference the allegations of all preceding paragraphs as if fully set forth herein.

127. The Equal Protection Clause of the Fourteenth Amendment prohibits any state, or any person acting under color of state law, from intentionally discriminating against any person on the basis of race.

128. Plaintiff is African American and a member of a protected class.

129. The individual Defendants named in this Count, each acting under color of state law, intentionally treated Plaintiff less favorably than similarly situated non-African American City of Warren employees with respect to discipline and termination for off-duty, unadjudicated criminal charges, in light of (a) the falsity of the stated reason on the face of the public court record, (b) the absence of any pre-termination process, (c) the disparate

treatment of similarly situated non-African American employees, (d) the pattern of differential treatment Plaintiff experienced during his tenure with the City (including the prior two-year segregation from the Property Maintenance Department on terms not imposed on his Caucasian peers), and (e) Defendants' use of a record of an unadjudicated misdemeanor charge as the stated basis for termination.

130. The individual Defendants' summary termination of Plaintiff without process, based on a falsely characterized "felony" charge that was in fact a misdemeanor, would not have occurred but for Plaintiff's race.

131. The individual Defendants acted with the intent to discriminate against Plaintiff on the basis of race, or with deliberate indifference to the discriminatory effect of their conduct.

132. The right of a public employee not to be subjected to race-based intentional discrimination in the terms and conditions of his employment has been clearly established for at least half a century. See *Washington v. Davis*, 426 U.S. 229 (1976). No reasonable official in the position of any of the individual Defendants could have believed Plaintiff's summary, process-free, race-conscious termination on a falsely characterized charge was constitutionally permissible. See *Hope v. Pelzer*, 536 U.S. 730, 738–41 (2002).

133. As a direct and proximate result of the individual Defendants' conduct, Plaintiff has suffered the following damages:

   a. Damages for substantial economic loss and damage, including but not limited to medical expenses, lost wages and lost income;

   b. Damages for pain and suffering;

   c. Damages for embarrassment, humiliation, outrage, mental anguish, fear and mortification, and stress;

   d. Punitive damages; and

   e. Attorney fees and costs, pursuant to 42 U.S.C. § 1988.

**COUNT III**
**42 U.S.C. § 1983 — FIRST AMENDMENT RETALIATION**
**(Retaliation for Retention of Counsel)**

**(Against Defendant City of Warren and Defendants Lienemann, Dimas, and Ghanam, in their Individual Capacities)**

134. Plaintiff incorporates by reference the allegations of all preceding paragraphs as if fully set forth herein.

135. The First Amendment to the United States Constitution, including the Petition Clause, protects the right of an individual to seek and retain counsel for the purpose of defending himself against the State's exercise of investigative and prosecutorial authority. The Fourteenth Amendment's Due Process Clause protects against retaliation by state actors, acting under color of state law, for the exercise of that right.

136. On September 7, 2023, during a voluntary interview with Defendant Lienemann concerning the prior evening's incident, Plaintiff stated that he wished to retain counsel. Plaintiff's invocation and exercise of his right to seek and retain counsel was protected activity under the First and Fourteenth Amendments.

137. Approximately five (5) hours after Plaintiff invoked his right to counsel, on the very same day, Plaintiff was summarily terminated from his fifteen-year position with the City of Warren by Defendant Ghanam—who admitted to Plaintiff that he "didn't know what was going on" and "didn't want to know what was going on" and represented falsely that the charge was "now a felony" before any charge of any kind had been filed.

138. Plaintiff's summary termination, the after-the-fact September 11, 2023, "administrative leave" recharacterization, and the November 1, 2023, formal termination on a falsely characterized "felony" ground, each constituted adverse action of the kind that would deter a person of ordinary firmness from exercising the right to retain counsel.

139. Upon information and belief, Defendant Lienemann, directly or indirectly, communicated with one or more of Defendants Dimas and Ghanam and/or with Mayor Fouts concerning Plaintiff's invocation of counsel and/or the contemplated charging decision in advance of Plaintiff's September 7, 2023, termination, and Defendants Dimas and Ghanam thereafter took adverse action against Plaintiff in retaliation for Plaintiff's exercise of his right to counsel.

140. The unlawful temporal proximity—approximately five hours—between Plaintiff's invocation of counsel and his summary termination, together with Defendant Ghanam's

admission that he "didn't know what was going on," supports a strong inference of causal connection between Plaintiff's protected activity and his termination. Plaintiff's protected activity was a substantial or motivating factor in the individual Defendants' decision to terminate Plaintiff.

141. The right of a citizen to seek and retain counsel without state retaliation has been clearly established for decades. No reasonable detective, Human Resources Director, or supervisor could have believed it was constitutionally permissible to terminate a long-tenured public employee in direct response to that employee's invocation of his right to retain counsel.

142. The individual Defendants' conduct was undertaken intentionally, knowingly, willfully, wantonly, and maliciously, and in deliberate indifference to Plaintiff's clearly established rights.

143. As a direct and proximate result of the individual Defendants' conduct, Plaintiff has suffered the following damages:

a. Damages for substantial economic loss and damage, including but not limited to medical expenses, lost wages and lost income;

b. Damages for pain and suffering;

c. Damages for embarrassment, humiliation, outrage, mental anguish, fear and mortification, and stress;

d. Punitive damages, as against the individual Defendants only; and

e. Attorney fees and costs, pursuant to 42 U.S.C. § 1988.

## COUNT IV
## 42 U.S.C. § 1983 — FOURTH AMENDMENT MALICIOUS PROSECUTION
**(Against Defendant City of Warren and Defendant Lienemann, in his Individual Capacity)**

144. Plaintiff incorporates by reference the allegations of all preceding paragraphs as if fully set forth herein.

145. The Fourth Amendment to the United States Constitution protects against the initiation or continuation of a criminal proceeding without probable cause that results in a seizure of the person. See *Thompson v. Clark*, 596 U.S. 36 (2022); *Sykes v. Anderson*, 625 F.3d 294 (6th Cir. 2010).

146. To establish a claim of malicious prosecution under the Fourth Amendment, a plaintiff must show (1) that a criminal prosecution was initiated against him and that the defendant "ma[d]e, influence[d], or participate[d] in the decision to prosecute"; (2) that there was a lack of probable cause for the criminal prosecution; (3) that, "as a consequence of a legal proceeding," the plaintiff suffered a deprivation of liberty apart from the initial seizure; and (4) that the criminal proceeding was resolved in the plaintiff's favor. *Sykes v. Anderson*, 625 F.3d 294 (6th Cir. 2010), at 308–09; *Fox v. DeSoto*, 489 F.3d 227, 237 (6th Cir. 2007). Malice is not an element of such a claim: the Sixth Circuit "has never required that a plaintiff demonstrate 'malice' in order to prevail on a Fourth Amendment claim for malicious prosecution," and the reasonableness of a seizure is assessed objectively, without regard to "the subjective state of mind of the defendant, whether good faith or ill will." *Sykes*, 625 F.3d at 309–10 (quoting *Brooks v. City of Winston-Salem*, 85 F.3d 178, 184 n.5 (4th Cir. 1996)). Plaintiff satisfies each element.

147. Defendant Lienemann, acting under color of state law, made, influenced, and participated in the decision to initiate and continue the criminal prosecution of Plaintiff by, among other things, conducting the September 7, 2023, interview, signing the September 25, 2023 "suspect" letter, communicating with Detective Twardesky to compel Plaintiff's surrender, and, upon information and belief, supplying or causing the supply of information to the prosecution and/or to court records that included the unsubstantiated and never-prosecuted "Midland bench warrant" entry referenced at Plaintiff's November 1, 2023 arraignment.

148. That Defendant Lienemann did not himself make the ultimate decision to charge Plaintiff does not absolve him. An officer may be responsible for commencing a criminal proceeding where he "ma[d]e, influence[d], or participate[d] in the decision to prosecute," and "the fact that [the defendant] did not make the decision to prosecute does not per se absolve [him] from liability." *Sykes*, 625 F.3d at 311 (quoting *Fox*, 489 F.3d at 237). An officer influences or participates in that decision where he makes "knowing misstatements ... to the prosecutor" or exerts "pressure or influence" over the person who decides to prosecute or who testifies in support of the charge, and where the impact of his falsehoods, misrepresentations, and omissions extends beyond the initial arrest to influence the plaintiff's continued detention. *Id.* at 314–16.

149. Defendant Lienemann's participation in and influence over the decision to prosecute Plaintiff was not limited to the transmission of truthful investigatory materials. Upon information and belief, Defendant Lienemann (a) supplied, or caused to be supplied, to the prosecution and/or to court or law-enforcement record systems the unsubstantiated "Midland bench warrant" entry—a matter Plaintiff had never heard of, having never been to Midland, Michigan in his life—which the prosecutor announced on the record at the outset of Plaintiff's November 1, 2023 arraignment, before Plaintiff's counsel could be heard, and which was thereafter never raised, prosecuted, or substantiated; and (b) omitted from his communications to the prosecution the exculpatory content of the Warren Police Department's own Crime Report (Case No. 230050500-001)—namely, that the complainants acknowledged the firearm "was never pointed at them," that Plaintiff stated he "never had his firearm on him, and never made any threats," and that the encounter occurred on or adjacent to Plaintiff's own property. That the prosecutor recited the purported Midland warrant on the record is direct evidence that Defendant Lienemann's misstatements reached and were relied upon by the decisionmaker. See *Sykes*, 625 F.3d at 316–17.

150. The intervening decisions of the prosecutor and the arraigning court do not break the chain of causation. Normal principles of causation apply to actions under 42 U.S.C. § 1983, and an officer may not escape liability on the ground that a judge's or prosecutor's independent decision intervened between his misconduct and the plaintiff's deprivation of liberty. *Malley v. Briggs*, 475 U.S. 335, 344 n.7 (1986). "[T]he chain of causation need not be considered broken [where the officer] deceived the subsequent decision maker or could reasonably foresee that his misconduct would contribute to an independent decision that results in a deprivation of liberty." *Sykes*, 625 F.3d at 316 (quoting *Higazy v. Templeton*, 505 F.3d 161, 177 (2d Cir. 2007)). As the Sixth Circuit has put it, officers who "have been instrumental in the plaintiff's continued confinement or prosecution ... cannot escape liability by pointing to the decisions of prosecutors or grand jurors or magistrates.... They cannot hide behind the officials whom they have defrauded." *Id.* at 317 (quoting *Jones v. City of Chicago*, 856 F.2d 985, 994 (7th Cir. 1988)).

151. The criminal prosecution of Plaintiff lacked probable cause. The Warren Police Department's own crime report acknowledged that the firearm was never pointed at the

female complainants—identified as Veronica Lewis and Veronica Miazga, volunteers with Together We Save—that Plaintiff stated he never had the firearm on him and made no threats, and that the encounter occurred on or adjacent to Plaintiff's own property after Lewis and Miazga had walked uninvited through Plaintiff's neighbor's yard at night. Plaintiff's neighbor, Colleen Wilson, appeared at the 37th District Court on May 2, 2024 and confirmed to the prosecution—in the presence of Plaintiff, Plaintiff's wife, and Plaintiff's counsel—that Lewis was the aggressor in the confrontation with Plaintiff.

152. As a direct and proximate result of Defendant Lienemann's initiation, influence, and participation in the prosecution, Plaintiff suffered a Fourth Amendment seizure, including without limitation: (a) being placed in handcuffs and escorted upstairs to the holding cell area at the Warren Police Department on November 1, 2023; (b) being held in a holding cell pending arraignment; (c) being required to strip down to his shirt, pants, socks, and underwear; (d) being required to surrender his necktie, belt, and jacket; (e) being placed under personal bond restrictions; and (f) being required to attend at least eight (8) court appearances over the course of approximately twelve (12) months pending trial. Each of these deprivations of liberty followed from, and was a consequence of, the legal process wrongfully instituted against Plaintiff. No arrest was made at the scene on September 6, 2023, and Plaintiff was never seized before the criminal complaint issued; the seizure Plaintiff suffered was therefore not an initial warrantless seizure but a deprivation of liberty imposed pursuant to and as a consequence of the wrongfully instituted proceeding. See *Wallace v. Kato*, 549 U.S. 384, 390 (2007) (malicious prosecution "remedies detention accompanied not by absence of legal process, but by wrongful institution of legal process"); *Sykes*, 625 F.3d at 308–09.

153. On November 4, 2024, the criminal proceeding terminated in Plaintiff's favor when a jury returned a unanimous verdict of NOT GUILTY. This favorable termination satisfies the favorable-termination element of malicious prosecution under *Thompson v. Clark*, 596 U.S. 36 (2022).

154. Although malice is not an element of a Fourth Amendment malicious-prosecution claim, *Sykes*, 625 F.3d at 309–10, Defendant Lienemann in fact acted with malice, ill will, retaliatory motive, and/or in conscious disregard of the absence of probable cause and of

Plaintiff's constitutional rights. Plaintiff pleads these facts in support of his claim for punitive damages and not as an element of the claim.

155. No reasonable detective could have believed it was constitutionally permissible to initiate, influence, and continue a criminal proceeding against Plaintiff under the circumstances alleged here.

156. As a direct and proximate result of Defendant Lienemann's conduct, Plaintiff has suffered the following damages:

a. Damages for substantial economic loss and damage, including but not limited to medical expenses, lost wages and lost income;

b. Damages for pain and suffering;

c. Damages for embarrassment, humiliation, outrage, mental anguish, fear and mortification, and stress;

d. Punitive damages, as against the individual Defendants only; and

e. Attorney fees and costs, pursuant to 42 U.S.C. § 1988.

**COUNT V**
**42 U.S.C. § 1983 — MUNICIPAL LIABILITY**
**(Monell v. Department of Social Services, 436 U.S. 658 (1978))**
**(Against Defendant City of Warren)**

157. Plaintiff incorporates by reference the allegations of all preceding paragraphs as if fully set forth herein.

158. A municipality is liable under 42 U.S.C. § 1983 for constitutional violations caused by (a) an official policy, (b) a widespread custom or practice, (c) a decision by a final policymaker, or (d) a failure to train, supervise, or discipline amounting to deliberate indifference. See *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). In this Circuit, a plaintiff states a claim against a municipality by plausibly alleging "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013). Plaintiff pleads each of these independent grounds.

159. Defendant City of Warren is liable under *Monell* for the violations of Plaintiff's constitutional rights alleged in Counts I, II, III, and IV on each of the following independent grounds: (a) Final Policymaker Liability—then-Mayor Fouts and/or Defendant Dimas (as Human Resources Director) held final policymaking authority under the Warren City Charter over the discipline and termination of City employees; their decisions to terminate Plaintiff without pre-deprivation process and on a knowingly false factual predicate constituted official policy of the City. (b) Ratification—The final policymakers of the City, including then-Mayor Fouts and Defendant Dimas, reviewed, approved, and ratified the decision to terminate Plaintiff without process and on a false predicate, thereby making that decision the official policy of the City. See *City of St. Louis v. Praprotnik*, 485 U.S. 112 (1988). (c) Custom or Practice—The City maintained a widespread custom and practice of summarily disciplining and terminating African American employees accused of off-duty misconduct without pre-deprivation process, while affording similarly situated non-African American employees pre-deprivation process and/or more lenient discipline; and tolerating race-based segregation within City departments, as evidenced by the prior two-year segregation of Plaintiff from the Property Maintenance Department. (d) Failure to Train or Supervise—The City failed to train, supervise, or discipline its Human Resources personnel, supervisory personnel, Mayor's Office staff, and Police Department personnel regarding (i) the constitutional requirements of pre-termination due process under *Loudermill*; (ii) the prohibition against race-based disparate treatment; (iii) the prohibition against retaliation for the exercise of constitutionally protected rights; (iv) the requirements of MCL 37.2205a; and (v) the prohibition against malicious prosecution; and such failure reflected deliberate indifference to the constitutional rights of City employees and citizens, and was the moving force behind the violations of Plaintiff's rights.

160. As a direct and proximate result of Defendant City of Warren's official policy, practice, custom, ratification, and/or deliberate indifference, Plaintiff has suffered the following damages:

a. Damages for substantial economic loss and damage, including but not limited to medical expenses, lost wages and lost income;

b. Damages for pain and suffering;

c. Damages for embarrassment, humiliation, outrage, mental anguish, fear and mortification, and stress;

d. Attorney fees and costs, pursuant to 42 U.S.C. § 1988.

**COUNT VI**
**RACE DISCRIMINATION IN VIOLATION OF MICHIGAN'S ELLIOTT-LARSEN CIVIL RIGHTS ACT, MCL 37.2101 et seq.**
**(Against Defendant City of Warren and Defendants Dimas and Ghanam)**

161. Plaintiff incorporates by reference the allegations of all preceding paragraphs as if fully set forth herein.

162. Michigan's Elliott-Larsen Civil Rights Act, MCL 37.2101 et seq. ("ELCRA"), prohibits an employer, agent of an employer, or any person from discriminating against an individual with respect to employment, compensation, or a term, condition, or privilege of employment because of race. MCL 37.2202(1)(a).

163. Defendants are "employers" within the meaning of MCL 37.2201(a). Each individual Defendant named in this Count was an "agent" of the employer within the meaning of ELCRA at all relevant times, and is subject to individual liability for personally participating in discriminatory conduct. See *Elezovic v. Ford Motor Co.*, 472 Mich 408 (2005).

164. Plaintiff is a member of a protected class (African American); he was qualified for his position and performed it satisfactorily for approximately fifteen (15) years; he suffered an adverse employment action (termination); and similarly situated non-African American employees were treated more favorably under comparable circumstances.

165. Defendants' stated reason for terminating Plaintiff—that the misdemeanor charge "amount[ed] to a felony"—was false and pretextual, and the true reason for the termination was Plaintiff's race, as demonstrated by, among other things, (a) the falsity of the stated reason on the face of the public court record, (b) the absence of any pre-termination process, (c) the disparate treatment of similarly situated non-African American employees, (d) the pattern of differential treatment Plaintiff experienced during his tenure (including the prior two-year segregation from the Property Maintenance Department), and (e)

Defendants' use of a record of an unadjudicated misdemeanor charge as the stated basis for termination.

166. Plaintiff's race was a motivating factor, and a "but for" cause, of Defendants' decisions to suspend and terminate his employment, as Plaintiff's similarly situated non-African American coworkers were treated differently under similar circumstances.

167. As a direct and proximate result of Defendants' discriminatory conduct, Plaintiff has suffered the following damages:

a. Damages for substantial economic loss and damage, including but not limited to medical expenses, lost wages and lost income;

b. Damages for pain and suffering;

c. Damages for embarrassment, humiliation, outrage, mental anguish, fear and mortification, and stress;

d. Exemplary damages; and

e. Attorney fees, expenses, and costs, pursuant to MCL 37.2802.

**COUNT VII**
**VIOLATION OF MCL 37.2205a**
**(Unlawful Use of Records of Misdemeanor Arrest, Detention, or Disposition Where No Conviction Resulted)**
**(Against Individual Defendants Dimas and Ghanam, in their Individual Capacities)**

168. Plaintiff incorporates by reference the allegations of all preceding paragraphs as if fully set forth herein.

169. MCL 37.2205a, a provision of Michigan's Elliott-Larsen Civil Rights Act, provides in relevant part that "[a]n employer, employment agency, or labor organization, other than a law enforcement agency of this state or a political subdivision of this state, shall not in connection with an application for employment or membership, or in connection with the terms, conditions, or privileges of employment or membership request, make, or maintain a record of information regarding a misdemeanor arrest, detention, or disposition where a conviction did not result."

170. Although the City of Warren, as a political subdivision, falls within the employer-level exception to MCL 37.2205a, that exception defines which employer entities are covered

by the statute; it does not insulate the individual natural persons who act as agents of such entities from personal liability for participating in the prohibited conduct. To hold otherwise would render ELCRA's individual-agent liability provision a nullity in all public-sector employment contexts—a result the Legislature did not intend. Each individual Defendant named in this Count is a natural person, not a political subdivision, and is individually liable under ELCRA's remedies provisions, MCL 37.2801 and MCL 37.2802. See *Elezovic v. Ford Motor Co.*, 472 Mich 408 (2005). This Count accordingly runs against Defendants Dimas and Ghanam in their individual capacities only, and not against the City of Warren.

171. The statute's exception for "information relative to a felony charge before conviction or dismissal" does not apply, because Plaintiff was never charged with a felony. The sole charge against Plaintiff was a misdemeanor under MCL 750.234e.

172. At the time Plaintiff was placed on unpaid administrative leave on September 11, 2023, no conviction had resulted. At the time Plaintiff was terminated on November 1, 2023, no conviction had resulted. On November 4, 2024, a jury unanimously acquitted Plaintiff, and no conviction has ever resulted.

173. Each individual Defendant named in this Count, in connection with the terms, conditions, and privileges of Plaintiff's employment, personally requested, made, and/or maintained records of information regarding Plaintiff's misdemeanor arrest, detention, and disposition where a conviction did not result, including without limitation: (a) the September 11, 2023 letter referencing "the incident that occurred on Wednesday, September 6, 2023" and imposing unpaid suspension; (b) the November 1, 2023 termination letter reciting "the police report dated September 6, 2023, involving misuse of carrying a concealed weapon and brandishing a firearm" and "these charges" as the basis for termination; (c) the internal HR and personnel records documenting the same; and (d) communications among and between Defendants regarding the pending misdemeanor charge.

174. Defendants' mischaracterization of the misdemeanor charge as a "felony" in the November 1, 2023 termination letter does not, and cannot, invoke the "felony charge" exception in MCL 37.2205a. That exception is defined by the actual legal character of the charge, not by an employer's erroneous or pretextual recharacterization of it.

175. Defendants' violations of MCL 37.2205a were willful, knowing, and in reckless disregard of Plaintiff's statutorily protected civil right to have his unadjudicated misdemeanor arrest, detention, and disposition excluded from consideration in the terms, conditions, and privileges of his employment.

176. As a direct and proximate result of Defendants' violations of MCL 37.2205a, Plaintiff has suffered the following damages:

a. Damages for substantial economic loss and damage, including but not limited to medical expenses, lost wages and lost income;

b. Damages for pain and suffering;

c. Damages for embarrassment, humiliation, outrage, mental anguish, fear and mortification, and stress;

d. Exemplary damages; and

e. Attorney fees, expenses, and costs, pursuant to MCL 37.2802.

## COUNT VIII
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
**(Against the Individual Defendants Dimas, Ghanam, and Lienemann, in their Individual Capacities)**

177. Plaintiff incorporates by reference the allegations of all preceding paragraphs as if fully set forth herein.

178. Under Michigan law, the elements of intentional infliction of emotional distress are: (a) extreme and outrageous conduct; (b) intent or recklessness; (c) causation; and (d) severe emotional distress. See *Roberts v. Auto-Owners Ins. Co.*, 422 Mich 594 (1985).

179. The conduct of the individual Defendants, taken individually and in combination, was extreme and outrageous, beyond all possible bounds of decency, and utterly intolerable in a civilized community. That conduct included, without limitation: (a) summarily terminating a fifteen-year, spotless-record African American public employee within approximately five hours of his invocation of the right to counsel during a police interview; (b) backdating an "administrative leave" letter to disguise the prior process-free termination; (c) initiating, influencing, and continuing a baseless criminal prosecution that subjected Plaintiff to handcuffs, a holding cell, and the indignity of being made to strip in

connection with arraignment; (d) creating, transmitting, or causing the entry of a fabricated "Midland bench warrant" in court records to lend false gravity to the charge against Plaintiff; (e) formalizing Plaintiff's termination on the same day as his arraignment by means of a letter falsely characterizing a misdemeanor as a felony; (f) coercing Plaintiff over a period of approximately twelve (12) months and at least eight (8) court appearances to accept a plea by means of repeated cancellations and conversions of trial proceedings; and (g) thereafter contesting Plaintiff's unemployment claim on a misconduct theory the State ultimately rejected, all directed at a man who had served the City for fifteen years, had never been disciplined, and was ultimately acquitted by a unanimous jury.

180. The individual Defendants engaged in this conduct intentionally and/or in reckless disregard of the substantial probability that severe emotional distress would result.

181. The individual Defendants' conduct directly and proximately caused Plaintiff to suffer severe emotional distress, including without limitation severe anxiety, sleeplessness, mental anguish, humiliation, embarrassment, loss of self-esteem, and damage to his standing in his church and community.

182. As a direct and proximate result of the individual Defendants' conduct, Plaintiff has suffered the following damages:

a. Damages for substantial economic loss and damage, including but not limited to medical expenses, lost wages and lost income;

b. Damages for pain and suffering;

c. Damages for embarrassment, humiliation, outrage, mental anguish, fear and mortification, and stress;

d. Exemplary damages; and

e. Costs and interest as permitted by law.

**WHEREFORE**

Plaintiff respectfully requests that this Court enter judgment against Defendants, providing the following relief:

a. Back-pay, with prejudgment interest;

b. Front-pay;

c. Compensatory damages in whatever amount Plaintiff is found to be entitled;

d. An injunction barring Defendants from taking any further discriminatory or retaliatory actions or omissions against Plaintiff;

e. An order requiring expungement of any records maintained in violation of MCL 37.2205a;

f. An award of reasonable attorney's fees, expenses, and costs pursuant to 42 U.S.C. § 1988 as to Plaintiff's federal claims, and pursuant to MCL 37.2802 as to Plaintiff's claims under the Elliott-Larsen Civil Rights Act;

g. Punitive damages as against the individual Defendants only on Plaintiff's federal claims, and exemplary damages on Plaintiff's state-law claims; and

h. Such other and further relief that the Court deems appropriate and just.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury on all issues so triable.

Respectfully submitted,

/s/ Leonard Mungo
Leonard Mungo (P43562)
Mungo & Mungo at Law, PLLC
Attorneys for Plaintiff
31700 Telegraph Rd., Ste 250
Bingham Farms, MI 48025
(248) 792-7557 (phone)
(248) 792-7303 (fax)
Caseaction@Mungoatlaw.com

Dated: August 31, 2026

# Warren City Code Article III — Civil Service Rules

(Secs. 25-23 through 25-134)

Sec. 25-23. - Positions exempt from article.

(a) The following positions shall be exempt from the operation of this article, so far as appointments to, promotion in and dismissal from the service are concerned and shall serve at the will of the appointing authority:

Members of all boards and commissions

Deputy city clerk

Deputy city treasurer

Deputy council secretary

Executive administrator to the mayor

Private secretary—Mayor

Stenographer-secretary, mayor's office

Community relations coordinator, mayor's office

Industrial commercial coordinator, mayor's office

Sanitary engineer, waste water treatment plant

City engineer

Public works superintendent

Sanitation superintendent

Water superintendent

Manager, insurance and safety division

Personnel assistant

Director of operations, housing commission

Assistant director of operations, housing commission

Maintenance assistant, housing commission

Helicopter mechanic

Crime M.I.S. specialist

Computer programmer I

Building and grounds superintendent

Beautification coordinator

Assistant controller

Associate manager of public works

Waste water specialist

Administrative supervisor, public service division

Building and safety engineering director

Assistant library director

Communications director

All department heads as follows:

- City attorney
- Controller
- Director of public service
- Planning director
- Police commissioner and fire commissioner
- City assessor
- Parks and recreation director
- Library director
- Personnel director
- Labor relations director

All part-time employees, part-time seasonal employees, co-op student employees, temporary appointments and special assignments.

All positions fully or partially funded by grants from the federal government and which are, by virtue of such funding, subject to federal statutes, rules or regulations regarding the qualifications for such positions, but only for so long as they are so funded and subject to such federal statutes, rules or regulations.

(b) Provided, however, that any person hereinabove exempted except elected officials, who shall have been, prior to the adoption of this article, employed by the City of Warren, the Charter Township of Warren or the Village of Warren, in any capacity affected by this article, shall, upon discontinuance of employment in such exempted position, be reinstated to the employment and duties classification held by such person at the time of acceptance of such exempted position; and provided, further, that in the event any city employee shall be appointed to any position

exempted by this article, such employee shall, upon written application therefor, receive a leave of absence for the period of time that such employee shall serve in such exempted position and such city employees who have been appointed shall, upon discontinuance of employment in such exempted position, be reinstated to the employment and duties classification held by such person at the time of acceptance of such exempted position. The titles listed above are not necessarily civil service titles but may represent working titles.

(c) Any person who appoints any person to a position not qualified or exempted under this article is guilty of a misdemeanor.

(Code 1967, § 2-114; Ord. No. 80-333, § 1, 2-24-87; Ord. No. 80-340, § 16, 6-9-87; Ord. No. 80-343, § 2, 8-25-87; Ord. No. 80-352, § 1, 5-10-88; Ord. No. 80-486, § 1, 9-26-95; Ord. No. 80-539, § 1, 12-8-98; Ord. No. 80-551, § 1, 1-25-00; Ord. No. 80-723, § 1, 8-19-14)

Sec. 25-24. - Merit system established.

There is hereby established a merit system for all positions in the civil service of the city, except as hereinafter qualified or exempted. All municipal personnel problems shall be approached so far as possible in a professional and impartial manner. Appointment to the city's service and promotions and transfers therein shall be based solely upon the fitness, training, seniority and experience of the individual, with no discrimination on account of race, color, religion, sex, age, national origin, height, weight, marital status, handicap, disabled veteran status or Vietnam veteran status.

(Code 1967, § 2-101)

Secs. 25-25—25-35. - Reserved.

Sec. 25-126. - Employees' status after abolishment of departments and positions.

In the case of such abolishment of any position, office or employment, the person holding such position, office or employment shall be thereby transferred to an equal job, demoted or laid off; provided, however, such person shall continue eligible for any other position in the civil service for which he or she may be qualified and shall be retained on the reemployment list by the civil service board.

(Code 1967, § 2-144)

Sec. 25-127. - Lay-offs—Causes enumerated.

The department head may, for reasons of economy or for more efficient administration, or when rendered necessary by lack of sufficient appropriation, lay off any employee in his or her department. Such persons shall continue eligible for reappointment to any position or vacancy in the city's service, and the civil service board shall retain the names of any such persons on its eligible list for appointment to any position which such person is qualified to fill.

(Code 1967, § 2-145)

Sec. 25-128. - Same—Procedure; employees' status.

When lay-off is necessary in a given classification, the employee with the least seniority shall be laid off and his or her name placed on the reemployment list for that classification, ranked in the inverse order of lay-off. If the employee had civil service status in another classification, he or she may request to be reemployed in that classification or may request demotion to the next lower grade in the service. Final disposition of such requests shall be made by the civil service board. When a vacancy exists in a given classification and a reemployment list exists for the classification, the person highest on the list will be notified of his or her appointment to fill the vacancy. If that person declines the appointment, such person shall be deemed to have resigned and his or her name removed from the reemployment list and the next highest person notified. A person on a reemployment list who declines appointment or who fails to respond within ten (10) days of notification, shall not be employed in that classification unless he or she completes another examination, is subsequently appointed pursuant to certification by the civil service board of an eligible list, and serves a new, full probationary period. A person's name may be removed from a reemployment list for other reasons satisfactory to the board, such as failure to maintain residency, failure of postal authorities to locate the person, and the like.

(Code 1967, § 2-146)

Sec. 25-129. - Demotions, suspensions, dismissals.

Demotions, suspensions or discharges shall be made only for inefficiency, incompetency, physical or mental incapacity, insubordination, neglect of duty, misfeasance or malfeasance in office. In all cases of reduction, demotion, lay-off, suspension or dismissal of any employee or subordinate, the appointing authority shall, within five (5) working days of the effective date thereof, furnish such employee and the civil service board with written notice of the reason or reasons for such reduction, lay-off, suspension or dismissal. Such notice may be delivered to such employee by certified U.S. mail, return receipt requested, or in the alternative, may be delivered personally by such appointing authority to such employee. In the latter case, such appointing authority shall make and deliver to the secretary of the civil service board a verified affidavit of such personal delivery. The employee or subordinate shall have the right to make and file a written answer to the charges placed against him or her, and to file same with the civil service board within ten (10) working days from and after receipt of the notice. Nothing herein contained shall limit the power of an appointing officer or department head to suspend without pay for purposes of discipline any person under his or her supervision for a reasonable period not to exceed five (5) days; provided, however, that the civil service board shall have jurisdiction to review such suspension and to make a final determination regarding same.

(Code 1967, § 2-147)

Sec. 25-130. - Tenure in office, requisites; dismissal, review.

The tenure of a position in the city's service shall be only during good behavior and efficient service. The civil service board shall have the power to review all dismissals and all suspensions imposed for more than five (5) days.

(Code 1967, § 2-148)

Sec. 25-131. - Filing of charges against employees, filing.

Any charge preferred by a citizen against any person under the merit system employed by the city during his or her working hours shall be made in writing and under oath and filed with the civil service secretary. All communications to the civil service board or any member thereof touching their duties as such shall be made in writing and filed with the civil service secretary.

(Code 1967, § 2-149)

Sec. 25-132. - Hearing for discharge, removal, suspension—Hearing.

In case of discharge or removal or suspension for more than five (5) days, any officer or employee feeling himself or herself aggrieved thereby shall have a right to file a petition with the civil service board within ten (10) working days from the effective date of such removal or suspension asking for reinstatement in the

service or other relief and giving reasons therefor. The civil service board shall grant the petitioner a hearing, which shall be either private or public at the option of the petitioner, provided that the petitioner may be represented by a representative of his or her own choice.

(Code 1967, § 2-150)

Sec. 25-133. - Same—Evidence, counsel.

The civil service board shall grant such hearing within ten (10) working days after the petition is filed. The hearing shall be deemed an investigation and not a trial, and the board shall not be bound by technical rules of evidence and procedure. It shall, however, conduct the hearing in an orderly manner, confine the scope thereof to matters set forth in the reasons for dismissal, and secure both to the petitioner and the dismissing officer a full and impartial hearing in regard thereto. Both parties shall be permitted to be represented by counsel and to produce witnesses or any other testimony they may have pertinent to the matter. The petitioner shall be entitled to first hear the testimony against him or her and to face his or her accuser. The petitioner and his or her witnesses shall then be permitted to be heard in his or her own defense. Hearsay evidence, as the term is commonly understood, excepting declarations against interest, shall not be deemed sufficient proof to warrant removal, demotion or suspension.

(Code 1967, § 2-151; Ord. No. 80-340, § 23, 6-9-87)

Sec. 25-134. - Same—Determination; appeal to court.

The civil service board shall make its decision on any appeal within ten (10) working days after the hearing. It shall have the power to pass upon the discharge or removal, suspension for more than five (5) working days, or other action from which the appeal has been taken, and may confirm, modify or reverse such action. The action of the civil service board on all such matters shall be final, except, however, that if such action results in removal or dismissal from employment, then such employee shall have rights of appeal to the circuit court of the county. If reinstated without discipline in the position from which he or she was removed, the employee shall be entitled to compensation from the time of his or her demotion or discharge until the time of his or her reinstatement. The dismissing authority and the petitioner shall be entitled to a copy of the findings of the civil service board upon request.

(Code 1967, § 2-152)

Sec. 25-135. - Determination of strike activity.

If an employee of the city, who is disciplined for activity deemed to be a strike under the provisions of Section 6 of Act 379, Public Acts of 1965 (MCL 423.206), requests a determination as to whether he or she did violate the provisions of that act, such determination may be undertaken by the civil service board if the

disciplined employee so requests in writing. In such event, the determination shall be made by a hearing conducted by the civil service board.

(Code 1967, § 2-153)

Secs. 25-136—25-145. - Reserved.